UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDREW MANCILLA,<br><br>                              Plaintiff,<br>          -against-<br><br>THE LAW OFFICES OF BRUCE E.<br>BALDINGER, LLC, and BRUCE E.<br>BALDINGER,<br>                              Defendants. | Civil Action No. 22-cv-5182<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff ANDREW MANCILLA ("Plaintiff" or "Mancilla"), by and through his

attorney, Robert Fantone, complaining of the Defendants herein, alleges as follows:

## NATURE OF THE ACTION

1.      Bruce Baldinger, a member of the New York and New Jersey Bar, by virtue of a

combination of his greed and gross incompetence, maliciously took advantage of, and defrauded,

the Plaintiff, an attorney who worked of counsel with Baldinger, of nearly half a million dollars.

2.      Baldinger's misconduct was egregious. First, Baldinger fraudulently induced

Mancilla into agreeing to work hundreds of hours on a harassment case on a contingency basis

knowing that Baldinger, due to his own legal incompetence, had nearly botched the case from

the beginning.

3.      Second, although Baldinger agreed to compensate Mancilla by paying Mancilla

75% of the 33.3% contingency fee, when Mancilla secured a $1.625 million dollar settlement for

the client, Baldinger refused to honor their agreement or compensate Mancilla for the hundreds

of hours and substantial success Mancilla achieved for the client.

4.      Third, when Mancilla refused to continue working with Baldinger if Baldinger would not honor their agreement, Baldinger retaliated by attempting to short payment to Mancilla on other outstanding hourly fee cases they shared.

5.      Finally, knowing Plaintiff planned to file a lawsuit to recover the amounts to which he was entitled, Defendant Baldinger refused to communicate with Mancilla and instead ran to court and filed a frivolous and improper anticipatory declaratory judgment action against Mancilla in hopes of controlling the narrative and forum.

6.      Unbelievably, and in complete abdication of his ethical obligations, Baldinger made several blatant misrepresentations to the New Jersey Court in a transparent effort to satisfy the pleading requirements for a declaratory judgment under New Jersey law.

7.      Baldinger's state lawsuit is limited in scope and constitutes a gross display of his willingness to disregard his ethical obligations in an effort to retain earnings he knows belongs to Mancilla.

8.      The instant lawsuit is intended to put an end to, and rectify, Baldinger's ego-driven bad faith and dishonesty.

## **PARTIES**

9.      Plaintiff Andrew Mancilla is a resident of, and domiciled in, the State of New York.  Mancilla was admitted to practice law in the State of New York and New Jersey in 2011. He is a partner at Mancilla & Fantone, LLP, and focuses primarily on litigation in state and federal courts.

10.      Defendant Baldinger is a resident of, and domiciled in, New Jersey.  Defendant Baldinger is the sole member of The Law Offices Of Bruce E. Baldinger, LLC, which has a primary business address in Morristown, New Jersey.

## JURSIDICTION AND VENUE

11.     The Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C.

§1332(a)(1) on the basis of diversity, as the Plaintiff and Defendant are domiciled in separate

states and the amount in controversy, without interest and costs, exceeds $150,000.

12.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. §1391(b)(1)

because the defendants reside in the District of New Jersey.

## JURY TRIAL DEMAND

13.     Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to

Fed. R. Civ. P. 38(b).

## FACTUAL BACKGROUND

### I.     Mancilla and Baldinger's Working Relationship

14.     In or about 2015, Mancilla was introduced to Baldinger as a family friend and a

litigator who operated his own law firm in New Jersey.

15.     In or about August 2020, Mancilla contacted Baldinger, who was nearly twice

Mancilla's senior, to discuss a potential class action Mancilla was considering.

16.     During the call, and unrelated to the class action, defendant Baldinger informed

Mancilla that he recently had let go of his longtime associate and could use Mancilla's help on a

few of his litigation matters.

17.     Mancilla agreed to work with Baldinger of counsel on a case-by-case basis.

18.     The parties did not enter any formal fee sharing agreement.  Instead, fees were

informally discussed on a case-by-case basis and for the most part, Mancilla trusted Baldinger

because Baldinger was introduced through Mancilla's family.

19.     The vast majority of matters on which Mancilla worked were based on clients that retained Baldinger prior to Mancilla's involvement and which, therefore, did not specifically list Mancilla's hourly rate in the retainer.  On these matters, Mancilla trusted Baldinger to pay him fairly in relation to Baldinger's respective retainers with the clients.

20.     On contingency cases, Baldinger proposed a fee sharing arrangement on a case-by-case basis.

21.     On two of these contingency cases, which involved the same client, Baldinger proposed to compensate Mancilla by paying Mancilla 40% of the $1/3^{rd}$ contingency fee, and Mancilla agreed to this arrangement, ran the cases, obtained favorable outcomes, and Baldinger paid Mancilla approximately 40% of the $1/3^{rd}$ contingency fee.

**II.      The Employment Matter**

22.     On the third contingency case, an employment sexual harassment and discrimination case ("Employment Matter"), Baldinger explained to Mancilla that his legal fee arrangement with the client was a contingency fee equal to 33.3% of the net award to the client ("Attorney Contingency Fee").

23.     Baldinger asked if Mancilla would be interested in joining the case with him on a contingency basis.

24.     Baldinger explained that the parties had attempted mediation but that the defendants essentially refused to negotiate.

25.     When Mancilla inquired as to why the defendants refused to negotiate, Baldinger claimed that he had no idea.

26.     Mancilla asked for a copy of the relevant documents in the matter to determine whether he was willing to accept the case on contingency and Baldinger provided Mancilla with a copy of the complaint and mediation statement to review.

27.     Mancilla investigated the complaint and mediation statement.

28.     Baldinger assured Mancilla that Baldinger had worked diligently to file the complaint, attempt to secure discovery, and that the defendants did not have any procedural defense of which he was aware.

29.     As a result of Mancilla's investigation and Baldinger's assurances, Mancilla agreed to work on the case with Baldinger on a contingency basis.

30.     Baldinger proposed that Mancilla join the case in an "of counsel" capacity and that Baldinger would split his Attorney Contingency Fee with Mancilla.

31.     Upon information and belief, Baldinger initially proposed a split of the Attorney Contingency Fee as follows: 65% to Baldinger and 35% to Mancilla.

32.     However, given that the case was still in its infancy and there was so much work to do on the case - as there was significant discovery outstanding, no depositions had been conducted, and two of the defendants had yet to answer - Mancilla declined Baldinger's proposal.

33.     Instead, Mancilla proposed that he and Baldinger agree to wait and see how much work each of them performs on the matter and decide at a later date how to split the Attorney Contingency Fee.

34.     Baldinger agreed to these terms.

35.     At or about this time, Mancilla was introduced to the client, entered his notice of appearance, and joined the litigation.

36.     Mancilla was assured by Baldinger that Baldinger had obtained the client's consent concerning Mancilla's role and that the client was informed and had consented to Baldinger compensating Mancilla on contingency out of the Attorney Contingency Fee.

37.     Over the course of the following year and a half, Mancilla invested well over 300 hours in legal work on the case, securing all the outstanding written discovery, completing all six fact-witness depositions, successfully opposing several motions by the defendants, and maintaining frequent communication with the client.

38.     Baldinger was seldom involved in the litigation.

39.     By court order, trial was scheduled to begin January 17, 2022.

40.     In or about November 2021, only two months before trial, the defendants filed a motion for summary judgment solely on the grounds that the complaint filed by Baldinger on April 22, 2019, was filed late, days beyond the statute of limitations.

41.     Mancilla was surprised at the motion papers, as Baldinger had not only assured Mancilla, prior to Mancilla agreeing to take the matter on contingency, that he had been diligent in filing the complaint and that the defendants did not have any procedural defense of which he was aware, but Mancilla's preliminary investigation of the relevant case documents provided by Baldinger (including the complaint) indicated that the client's resignation was "effective April 28, 2017," a date that was within the statute of limitations.

42.     Given Baldinger's claimed diligence, as well as his ethical obligations of candor to the court, Mancilla had no reason to doubt that these allegations were supported by the documents that Baldinger had in his possession prior to filing the complaint.

43.     Baldinger assured Mancilla that there was no merit to the defendants' statute of limitations defense.

44.     Shortly after the defendants filed their motions for summary judgment, and prior to Mancilla and Baldinger filing any opposition papers, the parties again attempted mediation.

45.     During the mediation the defendants refused to entertain any higher settlement offer than $10,000, although the mediator communicated that they may be willing to agree to $50,000 for purposes of mediation brackets.  The proposed brackets were rejected and the mediation failed.  The defendants refused any further negotiation on the grounds that they were expecting to win their summary judgment motion based on the statute of limitations defense.

46.     At or around this time, the defendants also notified Mancilla that they had raised the statute of limitations defense during their first mediation, prior to Mancilla's involvement, and that Baldinger was well aware that the defendants planned to mount this defense.

47.     When Mancilla inquired, Baldinger assured Mancilla that he had filed the complaint based on the information he had been provided, that the defendants' statute of limitations defense was meritless, and that their arguments were contradicted by the evidence.

48.     Baldinger also admitted, for the first time, that he was aware of the defendants' statute of limitations defense because defense counsel notified him of this defense during their first mediation, prior to Mancilla's involvement.

49.     Because Defendants' entire motion for summary judgment was based on the timeliness of the initial complaint filed by Baldinger, and, upon information and belief, because Baldinger felt responsible for this, Baldinger himself drafted the opposition papers and sent them to Mancilla for his approval for filing.

50.     Mancilla reviewed Baldinger's drafted motion papers and, at first glance, they seemed cognizable, though Mancilla had not yet had an opportunity to thoroughly review the defendants' arguments, evidence, or the law.

51.     Mancilla suggested seeking an extension to allow Mancilla to thoroughly review all the motion papers and conduct research and an extension was secured.

52.     Mancilla's review of the motion papers and the supporting exhibits revealed despite what the client may have told Baldinger, he had in fact filed the client's initial complaint later than any reasonably competent attorney should have filed it, and by doing so, had handed the defendants a virtually insurmountable statute of limitations defense.

53.     Simply put, despite the extraordinary strength of the client's claims and evidence corroborating same, and the horrific suffering the client was seeking to redress, Baldinger himself had given the defendants a procedural statute of limitations defense that created a substantial risk that the client's entire case would be dismissed.

54.     Baldinger's oversight was egregious.  Baldinger had been involved in the client's case for nearly nine (9) months prior to filing the client's complaint.  In addition, Mancilla learned that the client's resignation email, which was one of the key pieces of evidence relied on by the defendants to support their statute of limitations defense, was in Baldinger's possession two months prior to his filing of the complaint.

55.     In fact, the very first sentence in the client's resignation email stated that her resignation was "effective April 15, 2017."

56.     Despite this written evidence reflecting that the client resigned "effective April 15, 2017," which puts any competent attorney on immediate notice that the complaint should be filed prior to April 15, 2019, Baldinger negligently waited until April 22, 2019, to file the complaint.

57.     Despite Baldinger's awareness of his grave oversight and the statute of limitations defense that he was responsible for creating, when Mancilla confronted Baldinger, Baldinger

doubled down in his misrepresentations: repeating theories that simply ignored the law, mischaracterizing the evidence he had in his possession for years, and ultimately, by simply blaming the client.

58.     Mancilla also discovered that although Baldinger's drafted opposition papers had appeared decent at first blush, Mancilla's subsequent thorough review and investigation revealed Baldinger conducted virtually no research into the law, misunderstood the issue, ignored the evidence, and failed to assert key arguments.

59.     Mancilla advised Baldinger of Baldinger's oversights in his drafted opposition papers and began rewriting the opposition papers.

60.     Baldinger obtained an extension until December 27th to file the opposition papers.

61.     In the weeks leading up to December 27th, Mancilla worked tirelessly day in and day out to save the client's case. He conducted dozens of hours of deep dive legal research to protect the client's interests and redrafted virtually all of Baldinger's opposition papers.

62.     On December 27, 2021, after conducting dozens of hours researching, re-writing, and sending drafts to Baldinger to review, Mancilla advised Baldinger that he was finalizing the opposition papers for filing later that day.

63.     It was at this time that Mancilla proposed to Baldinger that Mancilla and Baldinger split the Attorney Contingency Fee 75% to Mancilla and 25% to Baldinger.

64.     Mancilla also proposed that Baldinger compensate Mancilla $5,000 for Mancilla's work on that day alone (essentially to cover the significant amount of administrative work Mancilla was separately taking on over the holidays).

65.     Baldinger agreed to Mancilla's proposal to split the Attorney Contingency Fee 75% to Mancilla and 25% to Baldinger, and also to compensate Mancilla $5,000 for that day ("Employment Matter Compensation Agreement").

66.     Baldinger could have easily refused, or countered, as the brief was largely completed and he was aware that Mancilla would be filing the opposition papers regardless of Baldinger's response., but Baldinger knew that Mancilla would do what was necessary to protect the client's interests.

67.     Baldinger assisted Mancilla by communicating with the client to edit and revise her certification while Mancilla put the finishing touches on the opposition papers.

68.     Later that evening, Mancilla filed the opposition papers.

69.     On January 26, 2022, Mancilla's opposition papers prevailed and the trial court, in a lengthy opinion read into the record, denied the defendants motions for summary judgment based on Mancilla's legal arguments.

70.     Shortly thereafter the defendants extended an offer of half a million in furtherance of their proposal to again attempt mediation.

71.     Within the first few hours of mediation the defendants offered $1,000,000, and the offers continued to increase as the mediation progressed throughout the day.

72.     During the mediation, and without consulting Mancilla, Baldinger unilaterally agreed with the client to cap the entire legal fee at $200,000 plus half of any amount, if any amount was obtained, over $1.5 million ("Capped Legal Fee").

73.     Baldinger's Capped Legal Fee arrangement with the client was substantially different than Baldinger's Attorney Contingency Fee arrangement with the client, as it decreased

the expected attorney's compensation by more than half for any settlement higher than $1.2 million.

74.     The defendants offered $1.625 million, which was conditionally accepted by the client.

75.     Under Baldinger's original Attorney Contingency Fee arrangement with the client, a settlement of $1.625 million would result in legal fees in an amount of $541,125.  That $541,125 would then be split in accordance with the Employment Matter Compensation Agreement between Mancilla and Baldinger, 75%, or approximately $405,843.75 to Mancilla, and 25%, or approximately $135,281.25, to Baldinger.

76.     However, under Baldinger's modified Capped Legal Fee arrangement, a settlement of $1.625 million would result in legal fees in an amount of $275,000, which would then be split in accordance with the Employment Matter Compensation Agreement between Mancilla and Baldinger, 75%, or approximately $206,250, to Mancilla, and 25%, or approximately $68,750, to Baldinger.

77.     Baldinger's modified agreement with the client effectively decreased Mancilla's compensation by $200,000, half of what he had agreed to under the Employment Matter Compensation Agreement.

78.     The client's acceptance of the settlement offer was conditioned upon ensuring her tax treatment would be as the defendants represented during the mediation.

79.     Upon learning of the Capped Legal Fee Agreement, Mancilla voiced his objection but Baldinger said it was too late, he had already agreed to it with the client.

80.     While the tax issue was still pending, the defendants filed a motion to re-argue the motion for summary judgment based on the statute of limitations issue.

81.     On or about May 11, 2022, faced with the prospect of doing yet more work on the case despite Baldinger's breach of their Employment Matter Compensation Agreement, Mancilla requested that Baldinger clarify with the client that the Capped Legal Fee Agreement was based upon the client's settlement at the mediation, and since the case had not settled at mediation, Attorney Contingency Fee arrangement applied to any settlement moving forward.

82.     Baldinger stated that if he was able to clarify with the client that the Attorney Contingency Fee applied moving forward, then Baldinger and Mancilla would be splitting the Attorney Contingency Fee 50/50.  Mancilla refused, explained that their deal was 75/25 split, and advised Baldinger that if Baldinger was going to renege on their agreement, Mancilla would no longer work with Baldinger on any matters.  The heated email conversation is as follows:





**me** 9:52 AM
to bbaldinger ⌄

Not a chance in hell. You keep that deal in place. You fucked up by unilaterally agreeing to decrease the attorney fee to 200k without clearing it with me. Your obligation is to speak to the client to ensure that original deal is in place, not try to renegotiate that deal with me by speaking to the client to get back what you had no right to unilaterally agree to. I'll do the opposition papers if you clarify with the client that the original 1/3rd is in place. But you don't get to grab back 25% of the legal fee simply by clarifying with the client that the original 1/3rd is on the table. I don't care how much work you feed me. I dont need any of it. I was doing this to help you and because it was fun, but don't you dare try to fuck me on a deal or im out of all of it.

Respectfully,
Andrew



**Bruce Baldinger** 10:10 AM
to bbaldinger, me ⌄

Then do the work.



**Bruce Baldinger** 10:11 AM
Ok. Bye Sent from my iPhone On May 13, 20...



**me** 10:12 AM
to Bruce, bbaldinger ⌄

"Then do the work" "ok bye"- please clarify.

...

**Bruce Baldinger** 10:13 AM
to me ⌄

It means we are done working together. Reread your email.

83.     Baldinger attempted to use his control over the legal fee arrangement with the client to force Mancilla into agreeing to modify their Employment Matter Compensation Agreement to reflect a 50/50 split of the, now substantial, Attorney Contingency Fee.

84.     Upon information and belief, shortly thereafter, in June 2022, the client signed the settlement agreement and Employment Matter settled for $1.625 million.

85.     Upon information and belief, Baldinger received a windfall of approximately $275,000 and declined to notify or pay Mancilla any of the proceeds.

86.     June 16th and June 23rd, 2022, Mancilla demanded Baldinger inform him as to any settlement amount and Baldinger ignored Mancilla's request.

87.     Baldinger did not communicate to Mancilla any information concerning the ultimate settlement amount or compensation to Mancilla thereafter.

88.     Baldinger has not compensated Mancilla on the Employment Matter since it settled.

89.     Baldinger made no attempt to resolve the amount to pay Mancilla on the Employment Matter since it settled.

### III.   The Kings County Matter

90.     Separately, in the Spring of 2022, and prior to Baldinger's breach of their Employment Compensation Agreement, Baldinger asked Mancilla if Mancilla had the bandwidth to take on a new hourly litigation matter with Baldinger in Kings County, Brooklyn ("Kings County Matter").

91.     The Kings County matter required significant work upfront and Mancilla advised Baldinger that if Mancilla was going to take the case on, it would require re-prioritizing some of

Mancilla's own law firm's cases and that therefore Mancilla would need to charge closer to his hourly rate of $500/hour.

92.     Baldinger and Mancilla both spoke to the potential clients and Baldinger explained to the clients that Mancilla would be handling the majority of the litigation because Mancilla is based in New York.

93.     After the initial intake call the clients requested Mancilla send them Mancilla's biography to determine whether to hire Mancilla and Baldinger.

94.     Mancilla did so and the clients agreed to retain Mancilla and Baldinger.

95.     Baldinger drafted the retainer that specifically provided that Mancilla's hourly rate was $600/hour.

96.     Over the next two months, Mancilla filed three separate emergency orders to show cause, obtained three separate temporary restraining orders, and worked almost exclusively on the Kings County Matter.

97.     Within the first three weeks of working on the matter, Mancilla notified Baldinger that Baldinger should speak with the client's about replenishing their retainer because based on Mancilla's firm's rate that he expected from Baldinger, which upon information and belief he represented to be $500/hour, the initial retainer was already exhausted.

98.     On a monthly basis, Mancilla sent Baldinger Mancilla's timesheet detailing the work Mancilla performed on the Kings County Matter.

**IV.     The Nevada Federal Matter**

99.     In or about Spring of 2022, Baldinger invited Mancilla to assist in an hourly matter representing a company in federal court in Nevada ("Nevada Federal Matter").

100.    Baldinger and Mancilla did not agree on the hourly rate that Mancilla would be paid for his assistance.

101.    Mancilla performed a number of hours of legal research, reviewed the evidence in the case, and drafted an order to show cause.

102.    Mancilla sent Baldinger Mancilla's timesheet on a monthly basis detailing the work Mancilla performed on the Nevada Federal Matter.

### V.    Mancilla's Attempted Resolution of the Fee Disputes

103.    Between March and June 2022 Baldinger sent Mancilla several checks for Mancilla's work on the Kings County and Nevada Matters.

104.    After Mancilla advised Baldinger that he would no longer work with Baldinger if Baldinger intended to breach their Employment Matter Compensation Agreement, Baldinger retaliated by attempting to short payment to Mancilla on the Kings County and Nevada Matters.

105.    On the Nevada Federal Matter, Baldinger attempted to pay Mancilla $225/hr, which Mancilla rejected.

106.    On the Kings County Matter, despite the retainer specifically providing that Mancilla's hourly rate was $600/hr, Baldinger attempted to pay Mancilla $225/hr, which Mancilla rejected.

107.    On June 16, 2022, Baldinger sent Mancilla a check representing what Baldinger claimed to be the outstanding amount owed to Mancilla for the Kings County Matter ("Balance Owed Check") and claimed to have already paid Mancilla the full amount owed on the Nevada Federal Matter.

108.    In response, Mancilla emailed Baldinger noting Mancilla's objection to the "balance owed," offered a resolution to the fee disputes, and demanded Baldinger inform Mancilla regarding the settlement status of the Employment Matter.

109.    Baldinger replied that he would review his file and respond the following week.

110.    Baldinger never responded the following week.

111.    On June 23, 2022, Mancilla sent Baldinger follow up letter demanding a response by Friday, June 24, 2022, and returned the Balance Owed Check to Baldinger.

112.    Baldinger ignored Mancilla's requests to resolve the instant fee disputes.

**VI.    Baldinger's Improper Anticipatory Declaratory Judgement Action**

113.    Instead, anticipating Mancilla would be filing the instant action, and in an attempt to dictate the forum, control the narrative, and gain a tactical advantage over Mancilla, on July 18, 2022, Baldinger ran to New Jersey State court in Morris County (the county in which his law firm is located) and filed an improper anticipatory declaratory judgment action against Mancilla ("Improper Anticipatory Declaratory Judgement Action").

114.    In the Improper Anticipatory Declaratory Judgement Action Baldinger seeks to void the Employment Matter Compensation Agreement (based on a fabricated claim of duress) and pay Mancilla a nominal amount for his work.

115.    Baldinger's Improper Anticipatory Declaratory Judgement Action is based upon, and contains, a multitude of falsehoods in utter disregard for his ethical obligations, including, among others:

      a.    In paragraph 14 of the Improper Anticipatory Declaratory Judgement Action, Baldinger misrepresented to the court that "[w]ith the opposition to the motion just days away and while Baldinger was in Italy, Mancilla contacted Baldinger

and stated that he was unwilling to complete the motion unless Baldinger provided Mancilla with 75% of the proceeds of any attorneys' fees obtained from the Matter.

b.  This is false. Mancilla never "stated that he was unwilling to complete the motion unless Baldinger provided Mancilla with 75% of the proceeds of any attorneys' fees obtained from the Matter." Quite the opposite, Mancilla instructed Baldinger to handle the client and her certification while Mancilla finalized the brief. Mancilla's text message to Baldinger assured Baldinger that: "[Mancilla] can continue helping with the citations, table of authorities and filing today [.....]."

c.  In paragraph 15 of the Improper Anticipatory Declaratory Judgement Action, Baldinger misrepresented to the court that "[k]nowing there was no means by which [Baldinger] could address the motion while overseas […], Baldinger had no option but to reluctantly agree to Mancilla's demand."

d.  Again, this is a complete lie.  Baldinger was in Italy from November 17-29, 2021, and the opposition papers were not due until December 27, 2021.  Baldinger was home and helping to draft the client's certification on December 27, 2021, when he agreed to the Employment Matter Compensation Agreement.

e.  In paragraph 15 of the Improper Anticipatory Declaratory Judgement Action, Baldinger falsely alleged that he was unable to address the motion papers.

f.  Again, this is false.  Not only had Baldinger drafted his own opposition papers, but on December 27, 2021, when he agreed to the Employment Matter Compensation Agreement, Baldinger was in fact "address[ing] the motion" by revising and editing the client's certification with the client.

g.  In paragraph 23 and 26 of the Improper Anticipatory Declaratory Judgement Action, Baldinger misrepresented to the court that he "has attempted to resolve the matter of the *quantum* of fees with Mancilla but Mancilla has virtually disappeared" and that Mancilla "has refused to accept payment."

h.  This is false.  Baldinger refused to respond to Mancilla or offer any payment whatsoever on the Employment Matter.  As stated above, the last correspondence from Baldinger was his statement on June 16, 2022, that he would review his file and respond the following week, which he never did.  Mancilla's follow-up attempts to contact Baldinger were ignored.

116.  Baldinger asserted these false allegations for the sole purpose of meeting the declaratory judgment pleading requirements in New Jersey.

117.  Notably, Baldinger's Improper Anticipatory Declaratory Judgement does not mention the other pending disputes between Mancilla and Baldinger.

118.  As of the filing of the instant Complaint it is unclear whether Baldinger has properly served Mancilla and Mancilla has not yet filed an answer.

## COUNTS RELATED TO THE EMPLOYMENT MATTER

### COUNT ONE
### BREACH OF CONTRACT

119.   Plaintiff hereby repeats, reiterates, and realleges all of the allegations of this Complaint previously set forth above as if fully set forth herein.

120.   Mancilla and Baldinger entered into the Employment Matter Compensation Agreement whereby Mancilla would receive 75% of the Attorney Contingency Fee and Baldinger would receive 25% of the Attorney Contingency Fee.

121.   Baldinger breached the Employment Matter Compensation Agreement by decreasing the Attorney Contingency Fee via the Capped Legal Fee arrangement.

122.   Upon information and belief, the Employment Matter Settled for $1.625 million in or about June, 2022, entitling Mancilla to approximately $405,843.

123.   Baldinger has refused to pay Mancilla the amount due.

124.   As a result of Baldinger's breach of contract, Mancilla suffered damages in an amount of $405,843 plus interest.

### COUNT TWO
### FRAUDULENT INDUCEMENT

125.   Plaintiff hereby repeats, reiterates, and realleges all of the allegations of this Complaint previously set forth above as if fully set forth herein.

126.   Baldinger asked Mancilla to work on the Employment Matter in exchange for compensation on a contingency basis.

127.   Baldinger made misrepresentations of fact to Mancilla.

128.   Baldinger knew that these misrepresentations were false.

129.    Mancilla agreed to take the Employment Matter on contingency based on Baldinger's misrepresentations.

130.    Mancilla reasonably relied on Baldinger's misrepresentations.

131.    Baldinger's material misrepresentations induced Mancilla to invest hundreds of hours of work in the Employment Matter on a contingency basis rather than charging his hourly rate of $500/hr.

132.    As a result, Mancilla worked hundreds of hours without being compensated thereby suffering damages in an amount to be determined at trial.

133.    Mancilla is also entitled to punitive damages against Baldinger for his intentional and fraudulent misrepresentation and to deter him, and actors like him, from engaging in such untoward activities.  This is especially prudent given his standing as an attorney admitted in both New York and New Jersey.

## COUNT THREE
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

134.    Plaintiff hereby repeats, reiterates, and realleges all of the allegations of this Complaint previously set forth above as if fully set forth herein.

135.    Mancilla and Baldinger entered into the Employment Matter Compensation Agreement.

136.    A material term of the Employment Matter Compensation Agreement was that the legal fee was based on Attorney Contingency Fee.

137.    Baldinger unilaterally exercised his contractual privity with the client to malevolently, and for his own gain, in an effort to deprive Mancilla of the benefits of their Agreement, modified the Attorney Contingency Fee with the client via the Capped Legal Fee.

138.     Upon information and belief, the Employment Matter settled for $1.625 million.

139.     As a result of Baldinger's breach of the implied covenant of good faith and fair dealing, Mancilla suffered damages in an amount of approximately $405,843.75 plus interest.

**COURT FOUR**
**QUANTUM MERUIT**

140.     Plaintiff hereby repeats, reiterates, and realleges all of the allegations of this Complaint previously set forth above as if fully set forth herein.

141.     Baldinger recruited Mancilla to handle the Employment Matter.

142.     Mancilla, in good faith, used his litigation experience and legal acumen to represent the Employment Matter client.

143.     As a result of Mancilla's good faith performance of his litigation services, he secured a settlement for Employment Matter in the amount of $1.625 million.

144.     Mancilla has a reasonable expectation of compensation in exchange for the performance of his litigation services to Baldinger.

145.     Based on Mancilla's going hourly rate, and industry standards and customs, the reasonable value of Mancilla's services on an hourly basis is over $200,000, plus interest.

146.     Baldinger has refused to pay Mancilla any monies on the Employment Matter.

147.     Thus, Mancilla has suffered damages of at least $200,000.

**COUNT FIVE**
**UNJUST ENRICHMENT**

148.     Plaintiff hereby repeats, reiterates, and realleges all of the allegations of this Complaint previously set forth above as if fully set forth herein.

149.     Mancilla rendered services on behalf of the Baldinger that resulted in a settlement for the client of $1.625 million.

150.    Mancilla's services enriched Baldinger no less than $275,000.

151.    Baldinger was enriched at Mancilla's expense.

152.    It is against equity and good conscious to permit Baldinger to retain monies that Mancilla seeks to recover.

153.    Thus, Mancilla is entitled to damages from Baldinger in an amount no less than $275,000, plus interest.

## COUNTS RELATED TO THE KINGS COUNTY MATTER

### COUNT SIX
### BREACH OF CONTRACT

154.    Plaintiff hereby repeats, reiterates, and realleges all of the allegations of this Complaint previously set forth above as if fully set forth herein.

155.    Baldinger and Mancilla entered an agreement whereby Mancilla would charge no less than $500/hr to Baldinger for legal services performed in relation to the Kings County Matter.

156.    Mancilla performed over 112 hours of legal services in the Kings County Matter.

157.    Baldinger materially breached this agreement to pay Mancilla no less than $500/hr by attempting to pay Mancilla a total of $225/hour on the Kings County Matter.

158.    Accordingly, Mancilla has suffered damages in the amount to be determined at trial, plus interest.

### COUNT SEVEN
### QUANTUM MERUIT

159.    Plaintiff hereby repeats, reiterates, and realleges all of the allegations of this Complaint previously set forth above as if fully set forth herein.

160.    Baldinger recruited Mancilla to handle the Kings County Matter.

161.    Mancilla, in good faith, used his litigation experience and legal acumen to represent the Kings County Matter client.

162.    As a result of Mancilla's retention on the Kings County Matter, Mancilla's performed over 112 hours of legal litigation services in good faith.

163.    Mancilla has a reasonable expectation of compensation in exchange for the performance of his litigation services to Baldinger.

164.    Based on Mancilla's going hourly rate, and industry standards and customs, the reasonable value of Mancilla's services exceeds the amount Baldinger attempted to pay Mancilla.

165.    Accordingly, Mancilla has suffered damages in the amount to be determined at trial, plus interest.

## COUNT EIGHT
## UNJUST ENRICHMENT

166.    Plaintiff hereby repeats, reiterates, and realleges all of the allegations of this Complaint previously set forth above as if fully set forth herein.

167.    Mancilla rendered services on behalf of the Baldinger in the Kings County Matter.

168.    Mancilla's services enriched Baldinger at Mancilla's expense.

169.    It is against equity and good conscious to permit Baldinger to retain monies that Mancilla seeks to recover.

170.    Accordingly, Mancilla has suffered damages in the amount to be determined at trial, plus interest.

## COUNTS RELATED TO THE NEVADA MATTER

### COUNT NINE
### QUANTUM MERUIT

171.     Plaintiff hereby repeats, reiterates, and realleges all of the allegations of this Complaint previously set forth above as if fully set forth herein.

172.     Baldinger recruited Mancilla to assist in handling the Nevada Matter.

173.     Mancilla, in good faith, used his litigation experience and legal acumen to represent the Nevada Matter client.

174.     As a result of Mancilla's retention on the Nevada Matter, Mancilla's performed over 30.8 hours of legal litigation services in good faith.

175.     Mancilla has a reasonable expectation of compensation in exchange for the performance of his litigation services to Baldinger.

176.     Based on Mancilla's going hourly rate, and industry standards and customs, the reasonable value of Mancilla's services on an hourly basis is more than Baldinger attempted to pay Mancilla.

177.     Accordingly, Mancilla has suffered damages in the amount to be determined at trial, plus interest.

### COUNT TEN
### UNJUST ENRICHMENT

178.     Plaintiff hereby repeats, reiterates, and realleges all of the allegations of this Complaint previously set forth above as if fully set forth herein.

179.     Mancilla rendered services on behalf of the Baldinger in the Nevada Matter.

180.     Mancilla's services enriched Baldinger at Mancilla's expense.

181.    It is against equity and good conscious to permit Baldinger to retain monies that Mancilla seeks to recover.

182.    Accordingly, Mancilla has suffered damages in the amount to be determined at trial, plus interest.

WHEREFORE, Plaintiff demands judgment against defendants as follows:

i.    For economic damages against all defendants, with statutory interest;

ii.    For compensatory damages against all defendants as the jury may determine;

iii.    For punitive damages against Baldinger as the jury may determine;

iv.    For costs, disbursements, and reasonable attorneys' fees; and

v.    For such other and further relief as the Court deems just and proper.

Dated: August 23, 2022
           New York, New York

                                                    **MANCILLA & FANTONE, LLP**

                                        By:    /s/ Robert Fantone
                                                  Robert Fantone, Esq.
                                                  260 Madison Avenue, 22nd Floor
                                                  New York, New York 10016
                                                  P (646) 225-6686
                                                  F (646) 655-0269
                                                  robert@law-mf.com


                                                  *Attorneys for Plaintiff*